*395
 
 AlleN, J.,
 

 dissenting. I concur in the judgment in the case of Sullivan et al. v. State, ex rel. O’Connor, upon the ground that the failure of the notary public, who took the acknowledgment of O’Connor and administered the oath to the petitioners, legibly to sign his name and print his name below the signature, was a technical defect which did not invalidate the petition. I dissent, however, in the companion cases, Sullivan et al. v. State, ex rel. Bringman, Sullivan et al. v. State, ex rel. Callahan, Sullivan et al. v. State, ex rel. Fall, Sullivan et al. v. State, ex rel. Haas, Sullivan et al. v. State, ex rel. Huber, and Sullivan et al. v. State, ex rel. Kilcorse, both upon the facts presented in the record and upon the law laid down by this court as applicable to those facts.
 

 It is significant that none of the material facts as to these six cases are given in the majority opinion. The opinion declares that the law requires that candidates for Democratic committeemen must be Democrats, and that if the board interpreted the law, it interpreted it correctly. Five of these relators, Bringman, Fall, Haas, Huber and ICilcorse, had their petitions rejected by the board of elections of Lucas county on the ground that they themselves were not Democrats. Yet the statement is made by all five of these relators, and nowhere denied, that they are life-long members of the Democratic party. The record shows that each one of them voted for a majority of the Democratic party in the election of 1930, and this fact is not disputed. Two of these relators, Fall and Kilcorse, are Democratic booth officials. Fall has been for 26 years a booth official of the Democratic party. In the Callahan case, the board of elections rejected Callahan’s petition, not upon the ground that he himself was not a Democrat, but upon the ground that the petition did not contain the signatures of five qualified Democratic electors, as required by statute. The petition was signed by eight electors purporting to be
 
 *396
 
 Democrats. Four of them are conceded by counsel for the board of elections to be Democrats, and otherwise qualified. Two of the signers of this petition, Buchholtz and Ziervogel, were eliminated upon the ground that they were not Democrats because they had voted at the Republican primary in 1930. They testified, and this fact was not denied, that they voted for a majority of the Democratic candidates in the general election of 1930. Hence the Callahan case, in addition to presenting certain other questions which it is not necessary to discuss here, raises the same legal question as the Haas and Huber cases. Haas and Huber were candidates whose petitions were rejected on the ground that they were not Democrats. They each voted in the Republican primary of 1930, but the fact that in the general election of 1930 they voted for a majority of Democratic candidates is not denied, nor is their testimony as to this fact impeached in any way.
 

 The Legislature could have made voting in the party primary in 1930 the test of party membership in 1932, but as a matter of fact the Legislature did not. The only test enjoined by the statute is that found in Section 4785-82, General Code, which is that party affiliations shall be determined by the largest number of candidates of any one party voted for by the electors at the last general election held in an even numbered year. Measured by this test, every one of the five candidates for nomination, rejected upon the ground that they themselves were not Democrats, is a Democrat, and Ziervogel and Buchholtz, who signed the Callahan petition, are Democrats, for there is not in this record anywhere any testimony even tending to contradict their declaration that they voted for the majority of Democrats in the last general election held m 1930, that is, in an even numbered year.
 

 The cases of Bringman, Fall and Kileorse are even stronger than those of Haas and Huber. They did not
 
 *397
 
 vote in the Republican primary. They simply signed certain petitions for Republican candidates. It was stated by Bringman, Fall and Kilcorse, and not denied, that each of them inadvertently signed Republican petitions. Fall stated that he did not know the candidate whose petition he signed, nor his politics. Kilcorse stated that he did not think anything about it. Bringman said that he did not intentionally sign any Republican petition, and could not remember the exact time when this happened.
 

 If the inadvertent signing of a petition, without knowing who is the candidate whose petition is being signed, or what is his party, disqualifies a man who admittedly is a life-long member of a party from candidacy in that party, and if this court continues to hold that the decision of the county board of elections upon such point is final, regardless of such evidence as that here presented, then indeed freedom of candidacy is eliminated in this state.
 

 In the case of
 
 Hayes
 
 v.
 
 Kentucky Joint Stock Land Bank, ante,
 
 359, 181 N. E., 542, recently decided by this court, Marshall, C. J., makes certain pertinent statements which I paraphrase here. The positive statement of these relators is not contradicted by any other witness or by any other circumstance. Standing uncontradicted, it must be accepted as proof in the absence of any testimony or circumstance from which a contrary inference can be drawn. The record discloses none. Paraphrasing again, from the opinion in the
 
 Hayes case, supra,
 
 if another witness had given testimony which contradicted these relators or these petition signers upon essential points, or if they had contradicted themselves or had made admissions which tended to support the proposition that they voted for a majority of other than Democratic candidates in the year 1930, a wholly different situation would be presented. The board of elections could not wholly disregard their testimony, neither could it draw
 
 *398
 
 inferences directly contrary to their affirmative statements. The fact of requesting a Republican primary ballot in the primary, the fact of inadvertently signing a Republican petition, had no probative value, because the test established by the Legislature is that party affiliations shall be determined by the largest number of candidates of any one party voted for by the electors at the last general election held in even numbered years.
 

 The statement of these relators as to that fact could be impeached. If, for instance, any one of them had stated subsequent to the general election of 1930 that he had voted for a majority of Republican candidates at such election, such testimony would have been competent, material, and highly probative, upon the question of party affiliation. The record presents no such testimony.
 

 Certainly the facts above set forth constitute abuse of discretion, to remedy which the Court of Appeals rightly issued the writ of mandamus. The majority opinion avoids this issue by saying that allegations of abuse of discretion mnst be specific. What more specific allegation of abuse of discretion could be made than to state the above facts?
 

 But I question far more seriously that section of the syllabus which holds that this record is not subject to judicial review. Conceding that no fraud or corruption is shown, a finding of fact was made by the board of elections contrary to the uncontradicted facts. Have the courts no power under such circumstances?
 

 The establishment of autocratic boards which control our industrial, governmental and political functions presents a sinister phase of the drift in American group life. To turn over to the board of elections in every county power to disqualify candidates under circumstances such as those set forth in this record, where there is no testimony controverting the statement of these men that they voted for a majority of
 
 *399
 
 Democratic candidates in tlie last general election, where there is no material testimony controverting the statement of five of them that they are lifelong Democrats, where two of them are recognized as such by being Democratic booth officials, shows how far the courts have gone in ceasing to protect parity of elections.